UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 16-Civ-60661Dimitrouleas/Snow

PRASANT SHAH, individually and on
behalf of all others similarly situated,

      Plaintiffs,

vs.

DS HEALTHCARE GROUP, INC.,
DANIEL KHESIN, RENEE BARCHNILES,
DIANNE ROSENFELD, KARL
SWEIS, and MICHAEL POPE,

      Defendants.

_____/

## MOTION TO TERMINATE FOX ROTHSCHILD AND
## TO STRIKE VERIFIED EMERGENCY MOTION FOR TERMPORARY
## RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Defendant DS Healthcare Group, Inc. (the "Company"), by and through undersigned counsel, moves for judicial termination of Fox Rothschild's representation of the Company and to strike or deny the Motion for Temporary Restraining Order and Preliminary Injunction (the "Motion," DE 7) purportedly filed on behalf of the Company.  The Motion has been filed without authorization and against the wishes of the majority of the Company's shareholders and the person in actual control, Daniel Khesin.  The Motion's technical arguments regarding the Voting Agreements are unfounded, and, in all events, any claimed violations of the proxy solicitation rules are being cured.  The bottom line here is that the Fox Rothschild law firm is not authorized to act as counsel for the Company, the Motion should be denied or stricken, and Fox Rothschild's termination as Company counsel should be recognized by this Court.

## I.   PRELIMINARY STATEMENT

Mr. Khesin is in control of the Company by virtue of his valid accumulation of the voting rights of 56% of the Company's shares.  Mr. Khesin achieved this control based on his existing ownership of 20% of the voting shares of the Company, coupled with the execution of 31 separate Voting Agreements with shareholders holding in the aggregate 36% of the voting shares of the Company.  These Voting Agreements, fully valid and enforceable under Florida law, are an overwhelming demonstration of confidence in Khesin—and a resounding rejection of the former officers and directors—that must be recognized and respected by the Court.  While the import of these Voting Agreements could not be any clearer, these same shareholders have submitted sworn testimony reaffirming their desire that Mr. Khesin resume control of the Company.  Mr. Khesin's perfectly appropriate termination of the Fox Rothschild firm as Company counsel must therefore be validated by this Court.

Despite its termination, Fox Rothschild—in reality now representing the former or soon-to-be-former directors of the Company (the "former directors"), yet claiming to represent the Company—has come to this Court in an effort to thwart the will of the shareholders based on innuendos and accusations, causing great harm to the Company in the process.  At bottom, however, the former directors' argument for denying Mr. Khesin control—and maintaining their own positions—rests on their reed-thin contention that Mr. Khesin committed some technical violations of the proxy solicitation rules of the Williams Act.  These technical arguments wither in the face of the shareholders' plainly-expressed preference for Mr. Khesin.  And, even assuming for the sake of argument that Mr. Khesin failed to technically comply with the proxy solicitation rules[1], he clearly satisfied the underlying purpose of the Williams Act—full

---

[1]     The Company expressly denies that it violated any provision of the securities laws.

COFFEY | BURLINGTON

2601 South Bayshore Drive, Penthouse, Miami, FL 33133 · T. 305·858·2900 F. 305·858·5261

disclosure to shareholders—making any violation immaterial.  Moreover, based on Mr. Khesin's Schedule 14A Proxy Statement, which is set to be effective April 15, 2016—the very day after the hearing scheduled on the Motion for Temporary Restraining Order filed by the former officers and directors of the Company—the claimed proxy solicitation violations will be shortly cured. Thus, any relief sought by temporary restraining order or preliminary injunction is moot. Accordingly, the Court should honor the decision of the shareholders by terminating Fox Rothschild as Company counsel and striking its unauthorized motion for temporary restraining order and injunctive relief.

II.    FACTUAL BACKGROUND

    A.    **Mr. Khesin brings the former directors and CEO into the Company**

    The undisputed facts and the testimony of the Company's shareholders overwhelmingly support Mr. Khesin's control and his authority to terminate Fox Rothschild as Company counsel. The relevant and undisputed facts are briefly stated as follows.  Beginning in April 2015, with the full agreement of Mr. Khesin, the Company replaced three of its four board of directors with Michael Pope, Karl Sweis, and Dianne Rosenfeld.  Mr. Khesin remained as a director and the chairman.  In October 2015, in order to focus on product development, Mr. Khesin stepped down as CEO of the Company in favor of Renee Barch-Niles.  Mr. Khesin took the title of President.

    B.    **The former directors ill-conceived internal investigation and SEC filings**

    In March 2016, Mr. Pope, Mr. Sweis, Ms. Rosenfeld, and Ms. Barch-Niles initiated an internal investigation into the Company.  Pursuant to that internal investigation, they purported to discover wrongdoing by Mr. Khesin.  The inaccuracy and ill-motivation of that internal investigation is separately addressed by Mr. Khesin in his own filing with this Court, which will be made contemporaneously with this one. The former directors also purported to terminate Mr.

Khesin's employment.  The invalidity of that action is also addressed separately by Mr. Khesin in his filing.

On March 23, 2016, the former directors filed an 8-K with the SEC reporting that the Company would be restating its income in the second and third quarters of 2015 based on improperly recognized revenue, and further reporting that the Company had terminated Mr. Khesin's employment.   The 8-K filed on March 23, 2016 is attached hereto as Exhibit A.  On March 28, 2016, the former directors filed another 8-K with the SEC reporting that its financial statements for the second and third quarters of 2015 should not be relied on, and included quotes from Ms. Barch-Niles that "new management" and the "board of directors" were taking steps to address the issues that they had supposedly discovered. The 8-K filed on March 28, 2016 is attached hereto as Exhibit B.

### C.    The shareholders transfer their voting rights to Mr. Khesin so he can regain control of the Company

In reaction to these developments—which he believed to be akin to an ill-motivated witch hunt, without any support whatsoever, and highly damaging to the Company—Mr. Khesin began contacting shareholders of the Company in an effort to muster support to regain control of the Company.  The results of these efforts were the signing of Voting Agreements with 31 different shareholders, representing 36% of the voting shares of the Company.  These Voting Agreements,  attached hereto as Composite Exhibit C, transfer voting control of the shares to Mr. Khesin for a period of six months.

To date, at least eleven of the shareholders[2] have provided the Company with sworn

---

[2]    The Company expects to receive additional declarations from shareholders over the next day, and will supplement the record upon receiving these declaration.   The Company has been undertaking diligent efforts over the weekend to obtain declarations from each of the shareholders who signed the Voting Agreement, many of whom live internationally.

COFFEY | BURLINGTON

2601 South Bayshore Drive, Penthouse, Miami, FL 33133 · T. 305·858·2900 F. 305·858·5261

testimony reaffirm their support for Mr. Khesin. In their declarations, the shareholders testify that "at the time [the shareholder] signed the Voting Agreement, [the shareholder] was aware of the internal investigation initiated by the then-board of directors of DS Healthcare Group, Inc., and the allegations that Mr. Khesin and others had engaged in improper conduct in connection with the company." *See* Composite Exhibit D. The shareholders have also testified that they were "aware that the then-board of directors had attempted to terminate Mr. Khesin's employment. These issues were also public record because of the SEC filings and other press releases made by the then-board of directors." Finally, the shareholders have expressly testified that they signed the Voting Agreements for the purpose of putting Mr. Khesin in control: "I signed the Voting Agreement in order to allow Mr. Khesin to replace the board of directors and resume control of the company, adequately represent the interests of the shareholders, and restore stability to the company and the value of its stock." *Id.*

Mr. Khesin filed a Schedule 13D with the SEC on March 31, 2016, disclosing the increase in his beneficial ownership of voting shares in the Company. A copy of the Schedule 13D is attached hereto as Exhibit E. Prior to signing the Voting Agreement, Mr. Khesin owned approximately 20% of the voting shares of the Company. Along with the voting rights obtained through the Voting Agreements, Mr. Khesin therefore disclosed that he held the right to vote 56% of the shares of the Company.

### D. Mr. Khesin fires Fox Rothschild and hires the undersigned law firm

Under the Company's bylaws, attached hereto as Exhibit F, a holder of a majority of the shares can take action without a shareholder meeting. Section 3.10 provides that:

Any action required or permitted by the Act to be taken at any annual or special meeting of shareholders of the corporation may be taken without a meeting, without prior notice and without a vote, if the action is taken by the holders of outstanding stock of each voting group entitled to vote thereon having not less

5

than the minimum number of votes with respect to each voting group that would be necessary to authorize or take such action at a meeting at which all voting groups and shares entitled to vote thereon were present and voted.[3]

On April 2, 2016, having accumulated 56% of the voting shares of the Company, Mr. Khesin proceeded to terminate the law firm that had been representing the Company in its ill-conceived internal investigation.  A copy of this email correspondence is attached hereto as Exhibit G.  Fox Rothschild refused the instruction to cease its representation of the Company. *Id.*

Instead, on April 5, 2016, without authorization from Mr. Khesin, the Fox Rothschild firm filed the Motion verified by the since-suspended CEO, Ms. Barch-Niles.  Fox Rothschild purported to represent the Company.   On April 6, 2016, the Court ordered Mr. Khesin served with the Motion on or before April 7, 2016, gave any opposing party until April 11, 2016 to file a response, and set a hearing on the Motion for April 13, 2016 at 9:30 a.m. (DE 8.)[4]

Meanwhile, on April 4, 2016, out of an abundance of caution, the Company filed a Schedule 14A proxy statement, attached hereto as Exhibit H, disclosing that Khesin was soliciting proxies for the expressed purpose of "gain[ing] majority control in order to effect changes in the Registrant Corporation, including his return to the Corporation to effect changes in the Board of Directors and management with the goal of increasing investor confidence."

---

[3]     Section 3.02(3) of the Bylaws provides for shareholder action by majority vote at an annual or special meeting.

[4]     Having represented the Company, Fox Rothschild would obviously be conflicted from any representation adverse to the Company.  Rule 4-1.9 of the Florida Rules of Professional Conduct prohibits a lawyer who has represented a client in a matter from "(a) represent[ing] another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent; (b) us[ing] information relating to the representation to the disadvantage of the former client except as these rules would permit or require with respect to a client or when the information has become generally known; or **(c)** reveal[ing] information relating to the representation except as these rules would permit or require with respect to a client."

COFFEY | BURLINGTON

2601 South Bayshore Drive, Penthouse, Miami, FL 33133 · T. 305·858·2900 F. 305·858·5261

Since being notified of Fox Rothschild's unauthorized Motion purportedly filed on its behalf, the Company has retained the undersigned law firm to represent it at the hearing.

III.   **MR. KHESIN IS IN CONTROL OF THE COMPANY.**

    A.   **The Court must respect the preference of the majority for Mr. Khesin through execution of the valid voting agreements.**

The Shareholders of the Company have spoken, and they have done so clearly.  Mr. Khesin's holding of the right to vote 56% of the shares of the Company is extraordinary in the context of voting proxies for a publicly-traded company.  Proxy voting participation by individual shareholders is notoriously low.  According to one recent study of publicly traded companies, just 28 percent of the shares held by "retail shareholders" were voted in 2015. Analysis of Distribution and Voting Trends Fiscal Year Ending June 30, 2015, Broadridge Financial Solutions, available at http://media.broadridge.com/documents/Broadridge-Distribution-and-Voting-Trends-2015.pdf.   In recent years, the SEC has expressed "concern" over  the "significant lack of participation by retail investors in proxy voting."  See Concept Release on the U.S. Proxy System, S.E.C. Release No. 3052, File No. S7-14-10, July 14, 2010, available at https://www.sec.gov/rules/concept/2010/34-62495.pdf.

And not only have they spoken through the Voting Agreements, the shareholders have reaffirmed their support through their sworn statements.

In light of this remarkable showing of shareholder support, the Court must respect the validly-expressed  and incontestable will of the majority of the Company's shareholders.  *See Stone v. Holly Hill Fruit Products*, 56 F.2d 553, 554 (5th Cir. 1932) ("A stockholder, in taking stock in the ordinary corporation, submits, within the charter limits, to a guidance of the corporate affairs according to the will of the owners of a majority of the stock and through the directors whom the majority choose.").  Here, the Voting Agreements are conclusive evidence

COFFEY | BURLINGTON

2601 South Bayshore Drive, Penthouse, Miami, FL 33133 · T. 305·858·2900 F. 305·858·5261

that the shareholders of the Company want Mr. Khesin—not the terminated board of directors and officers—to control and run the Company.

**B.     The former directors provide no grounds for disregarding Mr. Khesin's control.**

Despite the pages of innuendo and inflammatory allegations, the former directors of the Company provide little discernable support for their argument in the Motion that Mr. Khesin does not control 56% of the shares of the Company. It appears that they make three arguments why the Court should ignore the expressed decision of the shareholders of the Company. The first two arguments in their Motion are essentially "throw-aways." First, the former directors weakly challenge the Voting Agreements on the perplexing ground that Mr. Khesin did not pay for them. Second, without legal support, and in a blatant attempt to deny Mr. Khesin the majority, they urge the Court to disenfranchise an unidentified group of shareholders on the ground that they have committed some unspecified wrongdoing. Their third and primary argument, is that Mr. Khesin violated the proxy solicitation rules in accumulating 56% of the voting rights. Each of these arguments is addressed in turn below.

**1.     The Voting Agreements are valid, and there are no grounds for disenfranchising any of the shareholders.**

The former directors of the Company challenge the Voting Agreements on the ground that "by his own submission, [Mr. Khesin] did not purchase those shares." Motion at 10. The former directors do not provide any authority at all to support their argument that Khesin does not have valid control over the voting power of these shares because he did not pay the shareholders. Indeed, there is no requirement in the federal securities laws that Khesin must pay for the right to vote the shares of shareholders who want him to act as their proxy. Shareholder voting agreements are presumptively valid, and their validity are to be measured under general

principles of state contract law.  *See, e.g., Glazer v. Glazer*, 374 F.2d 390, 407 (5th Cir. 1967),

*cert. denied*, 389 U.S. 831 (1967) (pre-*Bonner*, still binding in circuit) (applying state contract

law to determine validity of voting agreement among shareholders). It is well established that an

exchange of promises is adequate consideration for an enforceable agreement under Florida law.

*See, e.g., Vince v. Specialized Servs., Inc.*, 8:11-CV-1683-T-24, 2011 WL 4599824, at *3 (M.D.

Fla. Oct. 3, 2011) (citing *Santos v. Gen. Dynamics Aviation Servs. Corp.*, 984 So.2d 658, 661

(Fla. 4th DCA 2008)).[5]

The former directors also contend that "a review of the purported transferors of the shares

reflects that Khesin only secured his alleged majority interest by engaging in transactions with

the very people and entities that are the subject of the securities fraud reported to the SEC based

on the Committee's investigation."  (Motion at 11.)  Based on this bald statement, made without

any factual backup, the former directors contend that the shares of these unidentified

shareholders must be disregarded in accounting for Khesin's majority control.  This position,

which serves to disenfranchise the Company's shareholders on the sheer basis of innuendo and

accusation, is a legal nullity.  There is simply no grounds for preventing a shareholder from

voting shares based on vague and unproven allegations that they engaged in wrongdoing.   And

certainly the former management of the Company has no standing at all to make this challenge.

Perhaps most significantly, even if you substracted the supposedly invalid shares from Mr.

---

[5]     Even if the voting agreements did not qualify as enforceable contracts, they would still be
valid and enforceable as proxy appointments under Florida law. Under Fla. Stat § 607.0722, a
shareholder or other qualified person may vote the shares of another shareholder by proxy by
signing an "appointment form." Fla. Stat § 607.0722(2)(b)(1).  A proxy appointment form need
not conform to any special form "so long as a proxy conforms to the requirements of general
law." *Nettles Island, Inc. v. Ely*, 436 So.2d 278, 278 (Fla. 4th DCA 1983).  Finally, if there was
any problem with the Voting Agreements, "the proper parties to complain are the stockholders
who gave the proxies." *Abbey Props. Co. v. Presidential Ins. Co.*, 119 So.2d 74, 78 (Fla. 2d
DCA 1960).

Khesin's control—supposedly 2,544,000 unidentified shares—he would still control a majority of the shares. ((12,467,157 – 2,544,000) / (22,148,675 – 2,544,000) = **50.6%.**)

> **2.    Mr. Khesin's alleged technical violations of the proxy solicitation rules are insufficient to deny the control vested in him by the shareholders.**

Besides their weak arguments that the Voting Agreements are invalid because Mr. Khesin did not pay for them and their wholly unsupported attempt to disenfranchise some of the Company's shareholders,  it appears that the former directors' primary contention is that Mr. Khesin does not have voting control of a majority of the Company's shares because he did not file a proxy statement before accumulating these shares. Yet, even assuming Mr. Khesin was required to file a proxy statement before soliciting the Voting Agreements, the purposes of the proxy solicitation rules were undeniably met here. Each solicited shareholder has testified that they had full knowledge of the purposes of Mr. Khesin's solicitation—to regain control of the Company—and affirmatively wanted him to take steps to regain that control.   Because Khesin's solicitation of proxies without first filing a proxy statement is merely a technical violation of the Williams Act—at most—there are no grounds here for contravening the clearly-expressed will of the majority of the Company's shareholders.

The solicitation of proxies is governed by Section 14 of the Exchange Act and Regulation 14A thereunder. Section 14 was passed to ensure that reasonable shareholders have all necessary information considered "important in deciding how to vote." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).  *Accord Trinity Wall St. v. Wal-Mart Stores, Inc.*, 792 F.3d 323, 335 (3d Cir. 2015) ("The SEC's proxy rules are concerned with assuring full disclosure to investors of matters likely to be considered at shareholder meetings.").  For that reason, in determining whether the proxy solicitation rules have been satisfied, courts must look to see whether the "total mix" of information provided to the shareholders gives adequate disclosure of the matters

COFFEY | BURLINGTON

2601 South Bayshore Drive, Penthouse, Miami, FL 33133 · T. 305·858·2900 F. 305·858·5261

to be voted on. *United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1198 (2d Cir. 1993). This total mix of information "may include data sent to shareholders by a company in addition to its proxy materials," *id.; see, e.g., Ash v. LFE Corp.*, 525 F.2d 215, 219 (3d Cir. 1975) (proxy statements need not "duplicate the financial data furnished to shareholders in the corporation's annual reports"), as well as other information "reasonably available to the shareholders," *Rodman v. Grant Found.*, 608 F.2d 64, 70 (2d Cir. 1979) (taking into account information already in the public domain and other facts publicly known to determine that the proxy statements at issue provided full and adequate disclosure). Federal courts have repeatedly rejected efforts to thwart the will of the shareholders of publicly-traded companies based on arguments of technical non-compliance with the proxy solicitation rules. "The alleged injury claimed must not result merely from a technical misadventure; it must undermine the purposes upon which the rule is based and actual damage must be susceptible to proof." *Ash v. GAF Corp.*, 723 F.2d 1090, 1094 (3d Cir. 1983) (internal quotations omitted).

Here, a number of the shareholders that provided a proxy to Khesin have testified that, at the time the shareholder signed the Voting Agreement on March 29, 2016, the shareholder was aware of the internal investigation initiated by the then-board of directors of DS Healthcare Group, Inc., and the allegations that Mr. Khesin and others had engaged in improper conduct in connection with the company.[6] *See* Exhibit D. The shareholders were also aware that the then-board of directors had attempted to terminate Mr. Khesin's employment. *Id.* As further testified to by the these shareholders, these issues were public record based on the SEC filings and other

---

[6]    As noted above, the Company expects to receive additional declarations from shareholders over the coming days, and will supplement the record upon receiving these declarations. The Company has been undertaking diligent efforts over the weekend to obtain declarations from each of the shareholders who signed the Voting Agreement, many of whom live internationally.

11

press releases made by the then-board of directors.  *See, e.g.*, Exhibit A (8-K dated 3/23/16, disclosing investigation of alleged improper transactions and termination of Khesin).

In light of this sworn testimony by the Company's shareholders, as well by the public disclosure of Mr. Khesin's alleged wrongdoing, it is apparent that the shareholders were provided the information that was "important in deciding how to vote," *TSC Indus.*, 426 U.S. at 449, which is the function of the proxy solicitation rules.  The very purposes of the rules having been satisfied here, a mere "technical misadventure" that does not "undermine the purposes upon which the rule is based" does not lend itself to a valid claim for relief under the securities law. *GAF Corp.*, 723 F.2d at 1094.  As expressed by one of the leading authorities on securities regulation "not. . . every illegally solicited proxy is *ipso facto* invalid so as automatically to void the election or any other action taken by its use."  LOUIS LOSS, JOEL SELIGMAN & TROY PAREDES, SECURITIES REGULATION § 2120.19 (3d ed. 2000).   Thus, technical violations of the proxy solicitation rules "should presumably be insufficient to set aside the vote."

In all events, Mr. Khesin will have cured any proxy solicitation violation within days of the hearing scheduled for Wednesday, April 13, 2016, mooting any challenge to his control of the Company.   After acquiring the voting rights through the Voting Agreements, Khesin subsequently filed a Schedule 14A proxy solicitation statement on April 4, 2016, a copy of which is attached hereto as Exhibit H.   This Schedule 14A contains all of the information required to apprise the shareholders of the Company of the purpose of the Voting Agreement (of which they were already aware).  Ten days after the filing of the Schedule 14A, on April 15, 2016, Mr. Khesin will be able to get affirmations of the Voting Agreements, curing any possible

violations of § 14(a).  Based on the shareholders continued confidence in Mr. Khesin, this is a near certainty.[7]

The case of *Cook United, Inc. v. Stockholders Protective Committee of Cook United, Inc.*, 1979 W.L. 1209 (S.D.N.Y. 1979) is instructive on this point. In that case, thirteen stockholders solicited prior to a definitive proxy statement being furnished to the stockholders. Accordingly, the district court found no harm caused by the delay because the proxy statement was furnished to the stockholders by the time the voting actually occurred. The court, therefore, denied a motion for preliminary injunction, and entered summary judgment in favor of defendants. The court opined:

> Plaintiff's objections to the manner in which defendants have conducted themselves seem overly technical and do not demonstrate how anyone has been prejudiced. After all, the purpose of the proxy laws is to permit the free exercise of the voting rights of stockholders by ensuring that proxies will be solicited with explanation to the stockholder of the real nature of the questions for which the authority to cast his vote is sought... That purpose is not served by elevating form over substance to disenfranchise stockholders where no injury has occurred.

*Id.*at *5.  *Accord Kaplan v. First Hartford Corp.*, 447 F. Supp. 2d 3, 10 (D. Mass. 2006) (rejecting a challenge to make adequate disclosures of put options in previous proxy solicitations because "the failure to describe the put options in proxies I and II… was effectively cured in proxy III.");  *Pantry Pride, Inc. v. Rooney*, 598 F. Supp. 891, 901-92 (S.D.N.Y. 1984) (finding that any defect in an original solicitation was cured through later disclosure that occurred prior to the stockholder vote); *Jewelcor Inc. v. Pearlman*, 397 F. Supp. 221, 249-250 (S.D.N.Y. 1975) (denying injunctive relief where initial misleading disclosure was subsequently cured through additional disclosure before any harm was done).

---

[7]     In a further request for alternative relief, the Company requests that the Court continue the hearing on the Motion for some reasonable period of time following the effective date of the proxy solicitation statement.

13

## IV.  FOX ROTHSCHILD HAS BEEN TERMINATED BY MR. KHESIN AND THE MOTION MUST BE STRICKEN AS IT WAS FILED WITHOUT AUTHORIZATION.

Having received control of a majority of the voting rights of the outstanding shares of the Company, Mr. Khesin was well within his rights to terminate Fox Rothschild's representation. Indeed, Section 3.10 of the Bylaws of the Company, attached hereto as Exhibit F allows a shareholder holding a majority of the voting interests of the Company to take action on behalf of the Company without a meeting.  It is also worth noting that Mr. Khesin, as president of the Company, was authorized to fire Company counsel.

Having been terminated by the Company prior to filing the Motion, the submission by Fox Rothschild is an unauthorized nullity that must be stricken. *See Goldfarb v. Daitch*, 696 So. 2d 1199, 1204 (Fla. 3d DCA1997) ("It seems fundamental that when an attorney appears before a court purporting to represent a party in a matter, and the court enters orders in reliance on that representation, if the court later concludes that the attorney did not in fact have authority to represent that party, the court may vacate orders entered at that attorney's behest.").

WHEREFORE, the Company respectfully requests that the Court deny or strike the Motion for Temporary Restraining Order and Preliminary Injunction, terminate Fox Rothschild's representation of the Company, and enter such other relief that the Court deems just and necessary.

COFFEY | BURLINGTON

2601 South Bayshore Drive, Penthouse, Miami, FL 33133 · T. 305·858·2900 F. 305·858·5261

Respectfully submitted,

COFFEY BURLINGTON

By:    *s/   Benjamin H. Brodsky*
      Kevin C. Kaplan
      Florida Bar No. 933848
      kkaplan@coffeyburlington.com
      lperez@coffeyburlington.com
      service@coffeyburlington.com
      Benjamin H. Brodsky
      Florida Bar No. 73748
      bbrodsky@coffeyburlington.com
      2601 South Bayshore Drive, Penthouse
      Miami, Florida 33133
      Telephone: (305) 858-2900
      Facsimile:  (305) 858-5261

      *Counsel for Defendant DS Healthcare, Inc.*

COFFEY | BURLINGTON

2601 South Bayshore Drive, Penthouse, Miami, FL 33133 · T. 305·858·2900 F. 305·858·5261

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on April 11, 2016 I served the foregoing document by CM/ECF to all counsel of record.

By: *s/   Benjamin H. Brodsky*
Benjamin H. Brodsky

COFFEY | BURLINGTON

2601 South Bayshore Drive, Penthouse, Miami, FL 33133 · T. 305·858·2900 F. 305·858·5261