**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 16-cv-60661-Dimitrouleas/Snow

| | |
|---|---|
| PRASANT SHAH, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>DS HEALTHCARE GROUP, INC., DANIEL KHESIN, RENEE BARCH-NILES, DIANNE ROSENFELD, KARL SWEIS, and MICHAEL POPE,<br><br>Defendants. | **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Prasant Shah ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's Amended Complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, announcements made by Defendants, a review of U.S. Securities and Exchange Commission ("SEC") filings by DS Healthcare Group, Inc., ("DS Healthcare" or the "Company"), wire and press releases published by and regarding DS HealthCare, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased the securities of DS Healthcare between May 15, 2014 and April 3, 2016 (the "Class Period"), inclusive, seeking to recover compensable damages caused by Defendants' violations of federal securities laws and pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §78j (b) and 78t (a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

3. This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

4. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) as the Company conducts business in this district and maintains its headquarters in this district.

5. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6. Plaintiff purchased DS Healthcare securities at artificially inflated prices during the Class Period and has been damaged thereby. His PSLRA certification was previously filed with the Court and is incorporated by reference herein.

7. Defendant DS Healthcare (doing business as DS Laboratories) is a Florida corporation headquartered at 1601 Green Road, Pompano Beach, Florida. DS Healthcare engages in the discovery and development of drug therapies for specialty pharmaceuticals as well as the commercialization of personal care products for its consumer brands in North America and internationally. DS Healthcare offers products in various categories, including hair health, hair care, skin care, personal care, anti-aging, and restructuring, as well as styling products. The Company distributes its personal care products through a network of domestic and international retailers and distributors. It also markets through online channels, specialty retailers, distributors, pharmacies, and salons. During the Class Period, the Company's securities were traded on NASDAQ under the symbol "DSKX."

8. Defendant Daniel Khesin ("Khesin") was the Company's Chairman of the Board of Directors and President from its inception until March 17, 2016. On March 17, 2016, all members of the Board other than Defendant Khesin, terminated the employment of Defendant Khesin as President for cause, and unanimously removed Defendant Khesin as Chairman of the Board of Directors and as a member of the Board for cause. Additionally, Defendant Khesin was the Company's Chief Executive Officer ("CEO") from its inception until October 26, 2015, and the Company's Chief Financial Officer ("CFO") from its inception until January 12, 2016.

9. Defendant Renee Barch-Niles ("Barch-Niles") has been the Company's CEO since October 26, 2015.

10. Defendant Dianne Rosenfeld ("Rosenfeld") has been a director of the Company and has served as the Chairman of the Company's Nominating and Corporate Governance Committee and as a member of the Company's Audit Committee, and Compensation Committee since August 1, 2015.

11. Defendant Karl Sweis ("Sweis") has been a director of the Company, and has served as the Chairman of the Company's Compensation Committee and as a member of the Company's Audit Committee, and Nominating and Corporate Governance Committee since May 8, 2015.

12. Defendant Michael Pope ("Pope") has been a director of the Company, and has served as the Chairman of the Company's Audit Committee and as member of the Company's Compensation Committee, and Nominating Committee and Corporate Governance Committee since April 29, 2015.

13. Defendants Khesin, Barch-Niles, Rosenfeld, Sweis, and Pope are collectively referred to hereinafter as the "Individual Defendants."

14. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

15. DS Healthcare is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

16. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to DS Healthcare under *respondeat superior* and agency principles.

17. Defendant DS Healthcare and the Individual Defendants are collectively referred to hereinafter as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements

18. On May 15, 2014, the Company filed a Form 10-Q for the quarter ended March 31, 2014 (the "2014 Q1 10-Q") with the SEC, which contained the Company's quarterly results for the period ended March 31, 2014. The 2014 Q1 10-Q was signed by Defendant Khesin. The 2014 Q1 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendant Khesin in his capacity as both CEO and CFO of the Company, attesting to the accuracy of financial reporting and that all fraud was disclosed.

19. On August 14, 2014, the Company filed a Form 10-Q for the quarter ended June 30, 2014 (the "2014 Q2 10-Q") with the SEC, which contained the Company's quarterly results for the period ended June 30, 2014. The 2014 Q2 10-Q was signed by Defendant Khesin. The 2014 Q2 10-Q contained signed SOX certifications by Defendant Khesin in his capacity as both CEO and CFO of the Company, attesting to the accuracy of financial reporting and that all fraud was disclosed.

20. On November 14, 2014, the Company filed a Form 10-Q for the quarter ended September 30, 2014 (the "2014 Q3 10-Q") with the SEC, which contained the Company's quarterly results for the period ended September 30, 2014. The 2014 Q3 10-Q was signed by Defendant Khesin. The 2014 Q3 10-Q contained signed SOX certifications by Defendant Khesin in his capacity as both CEO and CFO of the Company, attesting to the accuracy of financial reporting and that all fraud was disclosed.

21. On April 15, 2015, the Company filed a Form 10-K for the fiscal year ended December 31, 2014 (the "2014 10-K") with the SEC, which contained the Company's annual results for the period ended December 31, 2014. The 2014 10-K was signed by Defendant Khesin. The 2014 10-K contained signed SOX certifications by Defendant Khesin in his capacity as both CEO and CFO of the Company, attesting to the accuracy of financial reporting and that all fraud was disclosed.

22. On May 20, 2015, the Company filed a Form 10-Q for the quarter ended March 31, 2015 (the "2015 Q1 10-Q") with the SEC, which contained the Company's quarterly results for the period ended March 31, 2015. The 2015 Q1 10-Q was signed by Defendant Khesin. The 2015 Q1 10-Q contained signed SOX certifications by Defendant Khesin in his capacity as both CEO and CFO of the Company, attesting to the accuracy of financial reporting and that all fraud was disclosed.

23. On August 13, 2015, the Company issued a press release announcing its second quarter 2015 financial results, stating in relevant part:

> **DS Healthcare Announces Second Quarter 2015 Reporting Fourth Consecutive Quarter of EBITDAS Profitability**
>
> Company Reports EBITDAS of $116,313 Compared to an EBITDAS Loss of $781,096 in Prior Year

August 13, 2015 09:35 ET | Source: DS Healthcare Group, Inc.

POMPANO BEACH, Fla., Aug. 13, 2015 (GLOBE NEWSWIRE) -- DS Healthcare Group, Inc. (DSKX), "DS Healthcare" or "the Company" engaged in the development and discovery of drug therapies for specialty pharmaceuticals and innovative personal care products for its consumer brand has released financial results for the second quarter 2015.

Q2 2015 Highlights:

- Net revenues were $3,659,548 down 2.3% over Q2 2014
- Gross margins increase to 56% from 52% in Q2 2014
- Gross profits increase to $2,064,367 up 6.3% over Q2 2014
- Company reports GAAP loss of $9,551 compared to a loss of $635,172 in Q2 2015
- Adjusted EBITDAS, a non-GAAP financial measure resulted in a net gain of $116,313 from a loss of $781,096 in Q2 2014 a 114.9% increase over Q2 2014

"Today's announcement marks our fourth consecutive EBITDAS profitable quarter. We continue to demonstrate our ability to improve our gross margins while reducing our SG&A expenses and generating an operating profit. During the second quarter of 2014, we continued a series of efforts to improve the efficiency of our business. The second quarter results reflect the discipline that DS Healthcare has successfully executed in managing the variables within our control as well as the continued strength we've experienced in our domestic and international markets," stated Daniel Khesin, Chief Executive Officer of DS Healthcare. "Our focus has been, and continues to be, the consistent execution of our strategy and to be a valued partner to our key customers, relentless pursuit of operational excellence and value-added growth. We are optimistic that we will continue to be profitable with our management philosophy and drive shareholder value while continuously operating at the top of our industry.

"We are pleased about the level of engagement from our team members as we move into the second half of 2015. Through our budgeting process for next year we have further identified operational improvement opportunities that will continue to lead towards our mission of being the best managed and most respected company in the industry." Khesin concluded.

Gross sales for the three months ending June 30, 2015 were $4,037,097. Various one time credits and allowances to customers resulted in net revenues of $3,659,548, a decrease of 2.3% over revenues of $3,744,434 in the year-earlier period. Revenue in the second quarter was affected by an unfavorable exchange rate of the Mexican Peso to the US Dollar which was 15.65 Pesos to the Dollar at the end of the second quarter and 12.95 Pesos to the Dollar during the same period 2014.

Gross margin increased to 56% in the second quarter of 2015 from 52% in the same quarter of the prior year. This increase was a result of several factors including production efficiencies, strategic cost cutting efforts, increased sales of higher margin products and lower returns due to improved product quality. Gross profits were up 6% to $2,064,367 in the second quarter of 2015, as compared to $1,941,536 in the year-earlier period. Selling and marketing costs decreased by 25% to $890,766 in the recent quarter from $1,194,238 in the same period last year. General and administrative costs decreased by 14% to $1,147,325 as compared to $1,338,536 in the same period of 2014. DS Healthcare reported GAAP net loss narrowed by 98.4% to a net loss of $9,551 in the second quarter of 2015 compared to a net loss $635,172 in the same period of 2014.

On an adjusted EBITDAS basis, a non-GAAP financial measure, the second quarter of 2015 resulted in a gain of $116,313 compared to a loss of $781,096 in the year-earlier period.

For the six months ended June 30, 2015 net revenues were $6,463,468, a 0.5% increase from revenues of $6,429,397 for the six months ended June 30, 2014. Net revenue was driven in part by the Company's Mexican subsidiary, as well increased sell-through in foreign markets but was offset by a stronger dollar compared to foreign currencies.

Gross margin increased to 57.7% in the first half of 2015 from 53.3% in the first half of the prior year, as a result of improved production efficiencies, improved cost from suppliers, and cost cutting efforts including payroll. Gross profits were up 8.9% to $3,729,527 in the first half of 2015, as compared to $3,423,981 in the first half of 2014. Selling and marketing costs decreased by 23% to $1,667,544 in the six months ended June 30, 2015 from $2,164,240 in the same period last year. General and administrative costs decreased by 16.7% to $2,225,465 from $2,672,480 in the first two quarters of 2015. DS Healthcare's net loss decreased by 93.5% to $94,690 in the first half of 2014 from $1,453,324 in the same period of 2014.

On June 30, 2014 the Company had cash of $979,111 and working capital of approximately $5,million. Total shareholders' equity on June 30, 2015 was approximately $6 million.

**Adjusted EBITDAS**

We believe Adjusted Earnings Before Interest, Taxes, Depreciation, Amortization and Stock-Based Compensation ("Adjusted EBITDAS"), a non-GAAP financial measure, is useful in evaluating our operating performance compared to that of other companies in our industry, as this metric generally eliminates the effects of certain items that may vary for different companies for reasons unrelated to overall operating performance. We believe that:

> Adjusted EBITDAS provides investors and other users of our financial information consistency and comparability with our past financial performance, facilitates period-to-period comparisons of operations and facilitates comparisons with other companies, many of which use similar non-GAAP financial measures to supplement their GAAP results; and
>
> Adjusted EBITDAS is useful because it excludes non-cash charges, such as depreciation and amortization, stock-based compensation and one-time charges, which the amount of such expense in any specific period may not directly correlate to the underlying performance of our business operations and these expenses can vary significantly between periods

We use Adjusted EBITDAS in conjunction with traditional GAAP measures as part of our overall assessment of our performance, to evaluate the effectiveness of our business strategies and to communicate with our lenders, stockholders and board of directors concerning our financial performance.

Adjusted EBITDAS should not be considered as a substitute for other measures of financial performance reported in accordance with GAAP. There are limitations to using non-GAAP financial measures, including that other companies may calculate these measures differently than we do. We compensate for the inherent limitations associated with using Adjusted EBITDAS through disclosure of these limitations, presentation of our financial statements in accordance with GAAP and reconciliation of Adjusted EBITDAS to the most directly comparable GAAP measure, specifically net loss.

The following provides a reconciliation of net loss to Adjusted EBITDAS

| | **Three Months Ended June 30, (unaudited)** | |
|---|---|---|
| | 2014 | 2015 |
| GAAP Net Loss | **(85,138)** | **(9,552)** |
| Depreciation and amortization | **32,307** | **69,797** |
| Interest Expense | **13,855** | **26,957** |
| (Recovery) provision for bad debts | **(16,504)** | **9,848** |
| (Recovery) provision for obsolete inventory | **1,087** | **(16,997)** |
| Stock issued for services | **100,500** | **36,260** |
| Adjusted EBITDAS | $ 46,107 | $ 116,313 |

24. On August 14, 2015, the Company filed a Form 10-Q for the quarter ended June 30, 2015 (the "2015 Q2 10-Q") with the SEC, which contained the Company's quarterly results

for the period ended June 30, 2015. The 2015 Q2 10-Q was signed by Defendant Khesin. The 2015 Q2 10-Q contained signed SOX certifications by Defendant Khesin in his capacity as both CEO and CFO of the Company, attesting to the accuracy of financial reporting and that all fraud was disclosed.

25. On November 16, 2015, the Company filed a Form 10-Q for the quarter ended September 30, 2015 (the "2015 Q3 10-Q") with the SEC, which contained the Company's quarterly results for the period ended September 30, 2015. The 2015 Q3 10-Q was signed by Defendant Khesin. The 2015 Q3 10-Q contained signed SOX certifications by Defendants Barch-Niles and Khesin, attesting to the accuracy of financial reporting and that all fraud was disclosed.

26. On November 17, 2015, the Company issued a press release announcing its third quarter 2015 financial results, stating in relevant part:

> **DS Healthcare Third Quarter Revenues Grow 11% and Fifth Consecutive Quarter of EBITDAS Profitability**
>
> **Company Reports EBITDAS of $278,741 Up 98% Over Prior Year**
>
> November 17, 2015 08:00 ET | Source: DS Healthcare Group, Inc.
>
> POMPANO BEACH, Fla., Nov. 17, 2015 (GLOBE NEWSWIRE) -- DS Healthcare Group, Inc. (DSKX), "DS Healthcare" or "the Company" which engages in the development and discovery of drug therapies for specialty pharmaceuticals and the production of innovative personal care products for its consumer brand portfolio, has released financial results for the third quarter 2015.
>
> Q3 2015 Highlights:
>
> - Net revenues were $3,637,629 up 11.0% over Q3 2014
> - Gross margins decreased to 66.6% from 75.2% in Q3 2014
> - Gross profits decreased to $2,421,243 down 1.8% over Q3 2014
> - Adjusted EBITDAS, a non-GAAP financial measure resulted in a net gain of $278,741 from a gain of $140,489, a 98% increase over Q3 2014
> - Signed agreements to acquire W/R Group
> - Entered into a non-binding $35 million non-convertible senior debt term sheet
> - Named Renee Barch-Niles as its Chief Executive Officer

Renee Barch-Niles, Chief Executive Officer of DS Healthcare Inc. stated, "Our third quarter results included double-digit revenue growth driven by ongoing demand for our products both domestically and internationally. We've seen increased sell-through attributable to recently undertaken marketing initiatives—notably, our newly-optimized online store and associated digital advertising thereto. We believe the renewed attention given to all digital channels will provide a steady and significant source of future income, complementing our traditional physical footprint with global distributors. This marks the fifth consecutive quarter of EBITDAS profitability, and while EBITDAS was offset by non-recurring acquisition cost, we are pleased with the overall results. We continue to make progress in completing the independent W/R Group audit and lender due diligence."

"Overall, we achieved strong results that were fueled both by our business domestically and abroad, despite significant currency headwinds, particularly from the Mexican Peso. Of particular note are early, entries that we've made into the Chinese market," Barch-Niles continued. "An array of product launches, some already through the R&D pipeline and with imminent release into major retail channels, will help us continue to deliver long-term, sustainable, profitable growth," Barch-Niles concluded.

**Financial results:**

Gross sales for the three months ending September 30, 2015 were $4,073,088. Various credits and marketing allowances to customers resulted in net revenues of $3,637,629, an increase of 11% over revenues of $3,278,117 in the year-earlier period. Revenue in the third quarter was offset by an unfavorable exchange rate of the Mexican Peso to the US Dollar.

The gross margin for the three months ending September 30, 2015 declined to 66.6% from 75.2% in the same period the year prior. Gross profits were $2,421,243 in the third quarter of 2015, as compared to $2,464,446 in the year-earlier period. Selling and marketing costs for the three months ended September 30, 2015 increased $651,275 or 71.4% from $912,345 in the third quarter 2014 to $1,563,620. General and administrative costs decreased $272,747 or 16.3%, from $1,668,807 in the third quarter 2014 to $1,396,060 for the third quarter 2015.

On an adjusted EBITDAS basis, a non-GAAP financial measure, the third quarter of 2015 resulted in EBITDAS of $278,741 compared to $140,491 in the year-earlier period.

DS Healthcare reported net loss increase of $517,106 to a net loss of $571,602 in the third quarter of 2015 compared to a net loss $54,496 in the same period of 2014.

For the prior nine months ending September 30, 2015, total net revenues increased $393,593 or 4.1%, from $9,707,504 to $10,101,097 from the same period a year earlier.

On an adjusted EBITDAS basis, a non-GAAP financial measure, the nine months ending September 30, 2015 resulted in a EBITDAS of $441,161 compared to $(1,395,925) in the year-earlier period.

The gross margin for the nine months ending September 30, 2015 declined to 60.7% from 60.9% in the same period the year prior. Gross profits were up 4.5% to $6,150,770 in 2015, as compared to $5,888,426 in the same year-earlier period. Selling and marketing costs for the nine months ended September 30, 2015 increased $154,559 or 5.0% from $3,076,605 to $3,231,164. General and administrative costs decreased $716,761 or 16.6%, from $4,341,287 to $3,621,526 in the same period this year.

On September 30, 2015, the Company had cash of $1,375,290 and working capital of approximately $5.7 million. Total shareholders' equity on September 30, 2015 was $6,923,566.

| | Three Months Ended September 30, (unaudited) | |
|---|---|---|
| | **2015** | **2014** |
| GAAP Net Loss | **$ (571,602)** | $ (54,496) |
| Interest expense | **42,280** | 8,888 |
| Income taxes | **-** | (13,332) |
| Depreciation and amortization | **91,577** | 72,517 |
| Loss on disposal of fixed assets | **-** | 4,837 |
| Bad debts provision | **126,910** | 82,282 |
| Obsolete inventory provision (recovery) | **25,880** | (45,858) |
| Stock based payment costs | **563,696** | 85,653 |
| EBITDAS | **$ 278,741** | $ 140,491 |

**Adjusted EBITDAS**

We believe Adjusted Earnings Before Interest, Taxes, Depreciation, Amortization and Stock-Based Compensation ("Adjusted EBITDAS"), a non-GAAP financial measure, is useful in evaluating our operating performance compared to that of other companies in our industry, as this metric generally eliminates the effects of certain items that may vary for different companies for reasons unrelated to overall operating performance. We believe that:

> Adjusted EBITDAS provides investors and other users of our financial information consistency and comparability with our past financial performance, facilitates period-to-period comparisons of

> operations and facilitates comparisons with other companies, many of which use similar non-GAAP financial measures to supplement their GAAP results; and
>
> Adjusted EBITDAS is useful because it excludes non-cash charges, such as depreciation and amortization, stock-based compensation and one-time charges, which the amount of such expense in any specific period may not directly correlate to the underlying performance of our business operations and these expenses can vary significantly between periods

> We use Adjusted EBITDAS in conjunction with traditional GAAP measures as part of our overall assessment of our performance, to evaluate the effectiveness of our business strategies and to communicate with our lenders, stockholders and board of directors concerning our financial performance.
>
> Adjusted EBITDAS should not be considered as a substitute for other measures of financial performance reported in accordance with GAAP. There are limitations to using non-GAAP financial measures, including that other companies may calculate these measures differently than we do. We compensate for the inherent limitations associated with using Adjusted EBITDAS through disclosure of these limitations, presentation of our financial statements in accordance with GAAP and reconciliation of Adjusted EBITDAS to the most directly comparable GAAP measure, specifically net loss.

27. The statements referenced in ¶¶ 18 – 26 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) there was a kickback scheme involving channel stuffing and fraudulent sales; (2) the unaudited condensed consolidated financial statements for the two fiscal quarters ended June 30, 2015 and September 30, 2015 improperly recognized revenues related to certain DS Healthcare customers which did not meet revenue recognition criteria; (3) the unaudited condensed consolidated financial statements for the two fiscal quarters ended June 30, 2015 and September 30, 2015 contained certain equity transactions for the periods ended June 30, 2015 and September 30, 2015 that were not in accordance with

United States Generally Accepted Accounting Principles ("GAAP") and which were also not properly disclosed; (4) Defendant Khesin violated his fiduciary duty to the Company and its subsidiaries; and (5) as a result, Defendants' statements about DS Healthcare's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**<u>The Truth Emerges</u>**

28. On March 23, 2016 after the market closed, Defendant DS Healthcare filed a Form 8-K (the "Form 8-K") with the SEC which disclosed errors in its unaudited condensed consolidated financial statements for the two fiscal quarters ended June 30, 2015 and September 30, 2015 and stated these financial statements should no longer be relied upon. Defendant DS Healthcare further stated that it will restate the financial statements for two fiscal quarters ended June 30, 2015 and September 30, 2015, and that the adjustments will be material to investors when finalized. These errors related to revenue recognition for certain customers and certain equity transactions. Additionally, Defendant DS Healthcare disclosed that its Board of Directors terminated Defendant Khesin as its President for cause and removed him as its Chairman of the Board for cause. The Form 8-K stated in relevant part:

> **Item 4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**
>
> On March 18, 2016, the audit committee of the Board of Directors (the "Board") of DS Healthcare Group, Inc., a Florida corporation (the "Company") after discussion with the Company's Independent Registered Public Accounting Firm, Marcum LLP ("Marcum"), concluded that ***the unaudited condensed consolidated financial statements of the Company for the two fiscal quarters ended June 30, 2015 and September 30, 2015 (the "June and September 2015 Quarters"), should no longer be relied upon because of certain errors in such financial statements***. ***To the knowledge of the audit committee, the facts underlying its conclusion include that revenues recognized related to certain customers of the Company did not meet revenue recognition criteria in the June and September 2015 Quarters. Additionally, certain equity transactions in the June and September***

***2015 Quarters were not properly recorded in accordance with United States Generally Accepted Accounting Principles and also were not properly disclosed.***

The audit committee of the Board and the management of the Company have discussed these matters with Marcum, and both the audit committee and Marcum are continuing to review the relevant issues. ***Based on its current information, the Company believes that the adjustments to such interim financial statements will be material when finalized. As such, the Company intends to file amendments to its Form 10-Q Quarterly Reports for the periods ended June 30, 2015 and September 30, 2015, and restate the financial statements set forth therein, to the extent applicable, as soon as possible.***

**Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

On February 29, 2016, the audit committee of the Board, consisting of all members of the Board other than Daniel Khesin (at the time the Company's President and a member and the Chairman of the Board), engaged independent counsel to conduct an investigation regarding certain transactions involving Mr. Khesin and other individuals. The audit committee started this investigation, without outside counsel, earlier in February. This investigation includes, but is not limited to, the revenue recognition and equity transactions discussed in Item 4.02 above. The investigation is ongoing.

***On March 17, 2016, all members of the Board other than Mr. Khesin, terminated the employment of Mr. Khesin, as President and as an employee of the Company, and also terminated Mr. Khesin's employment agreement, dated December 16, 2013. The Board members terminated both Mr. Khesin's employment and employment agreement for cause. In addition, the members of the Board unanimously removed Mr. Khesin as Chairman and a member of the Board, also for cause. The Board terminated Mr. Khesin for cause from both his employment and Board positions because the Board believes, based on the current results of the investigation, that there is sufficient evidence to conclude that Mr. Khesin violated his fiduciary duty to the Company and its subsidiaries.*** We have filed the letter from the members of the Board to Mr. Khesin as an exhibit to this Current Report on Form 8-K.

On March 23, 2016, the Company provided Mr. Khesin with a copy of the disclosures it is making in this Item 5.02 and provided Mr. Khesin with an opportunity to furnish the Company with a letter addressed to the Company stating whether he agrees with the statements in this Item and, if not, stating the respects in which he does not agree. On March 23, 2016, through his counsel, Mr. Khesin has advised the audit committee of the Board that he disagrees with the findings of the audit committee and its independent counsel and believes that the termination as an executive officer of the Company, removal from the Board and termination

> of his employment agreement was not proper. We have filed the letter from Mr. Khesin's counsel in response to his termination as an exhibit to this Current Report on Form 8-K.
>
> [Emphasis added].

29. Attached as Exhibit 99.1 to the Form 8-K is a letter dated March 17, 2016 from the Company's Audit Committee to Defendant Khesin terminating Defendant Khesin as an executive officer and employee of the Company for cause, and removing Defendant Khesin as Chairman and as a member of the Board of Directors for cause, stating in relevant part:

> March 17, 2016
>
> Daniel Khesin
> 17689 Middlebrook Way
> Boca Raton, FL 33496
>
> Dear Mr. Khesin,
>
> Pursuant to Section 4.1(a)(i) of your Employment Agreement dated December 16, 2013, ***the board of directors of DS HealthCare Group, Inc. (the "Company") are hereby terminating your employment as an executive officer and employee of the Company for cause. In addition, the undersigned, as the remaining members of the Board of Directors of the Company are removing you as Chairman and a member of the Board of Directors, also for cause.***
>
> Based on an investigation conducted by independent counsel engaged by the audit committee of the Board of Directors, together with documentation submitted to members of the Board of Directors, ***the undersigned have concluded there is sufficient evidence to conclude that you have violated your fiduciary duty to the Company and its subsidiaries and may have also violated federal law.*** Accordingly, the independent members of the Board of Directors have determined that it is necessary and appropriate to terminate your employment and remove you as a member of the Board of Directors for cause, effective immediately.
>
> You are hereby ordered to vacate the Company's premises and are instructed not to attempt to destroy any documents or emails that you may have sent or received. You are also ordered to turn over to the Company all documents and property, both physical and digital that relate to the Company and are in your possession, including, without limitation, full access to all company emails. You are further notified that access to all confidential non-public information regarding the Company will be denied to you. In addition, you may not, under any circumstances, communicate with stockholders or other investors or with third parties that are or may be doing business or entering into transactions with the Company.

In accordance with the terms of Section 5.1 of your Employment Agreement, you will be paid your Base Salary thru and including today's date. No other compensation shall be due to you.

Please be so advised,

THE INDEPENDENT MEMBERS OF THE BOARD OF DIRECTORS OF DS HEALTHCARE GROUP, INC.

| | | |
|---|---|---|
| ____________________ Michael Pope | ____________________ Diane Rosenfeld | ____________________ Karl Sweis |

[Emphasis added].

30. On this news, shares of the Company fell $0.47 per share or over 35% from its previous closing price to close at $0.86 per share on March 24, 2015, damaging investors.

31. On April 3, 2016, the Company issued a press release disclosing, among other things, that Defendant Khesin "engaged in totally inappropriate conduct, including an illegal campaign of self-help, additional violations of the federal securities laws, as well as intimidation and defamation against Board members, management and outside professionals" prior to and subsequent to his dismissal and that Mark Brockelman tendered his resignation as the Company's Chief Financial Officer on April 2, 2016.

32. On this news, shares of the Company fell $0.18 per share or over 21% from its previous closing price to $0.67 per share before NASDAQ halted trading on April 4, 2016.

33. On April 4, 2016, the NASDAQ announced that trading was halted in the Company for "additional information requested" from the Company and that the trading halt will remain until the Company "as fully satisfied Nasdaq's request for additional information."

34. On April 5, 2016, the Company filed a verified emergency motion for temporary restraining order and preliminary injunction in this Court to protect the Company, its directors and shareholders from Defendant Khesin's alleged continued unlawful misconduct (the "TRO"). The

TRO disclosed that Defendant Khesin perpetrated "a kickback scheme involving channel stuffing and fraudulent sales" based on various emails in 2014 and 2015.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

35. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than Defendants who acquired DS Healthcare securities during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of DS Healthcare, members of the Individual Defendants' and Director Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Officer or Director Defendants have or had a controlling interest.

36. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, DS Healthcare securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

37. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

38. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

39. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business DS Healthcare;
- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Defendants caused DS Healthcare to issue false and misleading SEC filings during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and SEC filing
- whether the prices of DS Healthcare's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

40. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

41. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- DS Healthcare shares met the requirements for listing, and were listed and actively traded on NASDAQ, a highly efficient and automated market;

- As a public issuer, DS Healthcare filed periodic public reports with the SEC and NASDAQ;

- DS Healthcare regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

- DS Healthcare was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

42. Based on the foregoing, the market for DS Healthcare securities promptly digested current information regarding DS Healthcare from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

43. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States,* 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

**COUNT I**

**For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder**
**(Against All Defendants)**

44. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

45. This Count is asserted against DS Healthcare and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

46. During the Class Period, DS Healthcare and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

47. DS Healthcare and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of DS Healthcare securities during the Class Period.

48. DS Healthcare and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of DS Healthcare were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. Defendants by virtue of their receipt of information reflecting the true facts of DS Healthcare, their control over, and/or receipt and/or modification of DS Healthcare's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning DS Healthcare, participated in the fraudulent scheme alleged herein.

49. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other DS Healthcare personnel to members of the investing public, including Plaintiff and the Class.

50. As a result of the foregoing, the market price of DS Healthcare securities was artificially inflated during the Class Period. In ignorance of the falsity of DS Healthcare's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of DS Healthcare securities during the Class Period in purchasing DS Healthcare securities at prices that were artificially inflated as a result of DS Healthcare's and the Individual Defendants' false and misleading statements.

51. Had Plaintiff and the other members of the Class been aware that the market price of DS Healthcare securities had been artificially and falsely inflated by DS Healthcare's and the Individual Defendants' misleading statements and by the material adverse information which DS Healthcare's and the Individual Defendants did not disclose, they would not have purchased DS Healthcare securities at the artificially inflated prices that they did, or at all.

52. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

53. By reason of the foregoing, DS Healthcare and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to

the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of DS Healthcare securities during the Class Period.

**COUNT II**

**Violations of Section 20(a) of the Exchange Act**
**(Against the Individual Defendants)**

54. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

55. During the Class Period, the Individual Defendants participated in the operation and management of DS Healthcare, and conducted and participated, directly and indirectly, in the conduct of DS Healthcare's business affairs. Because of their senior positions, they knew the adverse non-public information about DS Healthcare's misstatement of revenue and profit and false financial statements.

56. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to DS Healthcare's financial condition and results of operations, and to correct promptly any public statements issued by DS Healthcare which had become materially false or misleading.

57. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which DS Healthcare disseminated in the marketplace during the Class Period concerning DS Healthcare's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause DS Healthcare to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of DS Healthcare within the meaning of Section 20(a) of the Exchange Act. In this capacity, they

participated in the unlawful conduct alleged which artificially inflated the market price of DS Healthcare securities.

58. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by DS Healthcare.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: April 14, 2016

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/Laurence Rosen
Laurence Rosen, Esq.
Fla. Bar No. 0182877
275 Madison Avenue, 34th Floor
New York, NY 10116
Phone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com

Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on this on the 14th day of April 2014 I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing documents are being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ Laurence Rosen